Santana KENNER, Appellant,

v.

KAPPA ALPHA PSI FRATERNITY, INC., a Corporation; James E. Brown; Eric S. Morris; Kevin Clark; Marlin Doster; Jwyanza V. Nuridden; Rhen Bass; Timothy Jones Damon Williams; Eric Cofield; and Milton Robinson, Appellees.

Superior Court of Pennsylvania.

Argued March 20, 2002
Filed Aug. 19, 2002.
Reargument Denied Oct. 28, 2002.

Jon R. Perry, Pittsburgh, for appellant.

Jason A. Mitchell, Pittsburgh, for Bass, appellee.

Thomas Campbell, Pittsburgh, for Morris, appellee.

Anthony J. Williott, Pittsburgh, for Clark, appellee.

Christine M. Seymour, Pittsburgh, for Brown, appellee.

Richard B. Tucker, Pittsburgh, for Nuridden, appellee.

BEFORE: JOHNSON, BENDER *, and MONTEMURO ** JJ.

JOHNSON, J.

¶ 1 Santana Kenner appeals from the trial court's order granting summary judgment in favor of Kappa Alpha Psi Fraternity, Inc. (Kappa), James Brown, Eric S. Morris, Kevin Clark, Jwyanza V. Nuridden, and Rhen Bass. Kenner discontinued his action against all remaining defendants before filing this appeal; accordingly, we are not concerned with those parties with respect to this appeal. Kenner contends that the trial court erred as a matter of law in concluding that Kappa did not owe a duty to Kenner. Kenner also argues that the court erred in finding the individual defendants were not liable for Kenner's injuries. After study, we conclude that the trial court did err in granting summary judgment in favor of Clark. Therefore, we affirm the trial court's order granting Kappa, Rhen, Nuridden, Morris and Brown summary judgment but reverse the order and remand for trial with respect to Clark.

¶ 2 By way of background, we note the following: Kappa is a national fraternity operating as a non-profit corporation headquartered in Philadelphia. Kappa has undergraduate, graduate and alumni chapters throughout the United States. Kappa maintains an undergraduate chapter at the University of Pittsburgh (Beta Epsilon Chapter).

¶ 3 In 1949, Kappa published a declaration opposing hazing in any form. In 1988, Kappa reiterated its opposition in the form of "Executive Order Number One." Two years later, Kappa eliminated the pledging process as a condition for membership. In its "Executive Order Number Two," Kappa prohibited "underground pledging" in addition to its ban on hazing.

¶ 4 On February 14, 1994, a Kappa pledge in Missouri died as a result of hazing. Thereafter, Kappa issued "Executive Order Number Three" imposing sanctions for participation in hazing or underground pledging. As a result of that death, Kappa instituted a national moratorium on receiving new members. During the moratorium, Kappa contemplated new policies and procedures that were to be in place when it eventually lifted the moratorium. In January 1996, Kappa lifted the moratorium after a two-year cessation of enrollment. In addition to its previous bans against hazing and pledging, each undergraduate chapter had to enter a "collaborative agreement" with its university. Additionally, each chapter, under the di-

---

* Judge Bender did not participate in the decision of this case.

** Retired Justice assigned to the Superior Court.

rection of the Province President, was to obtain chapter re-certification before the initiation process could begin. Because the University of Pittsburgh is located in Kappa's East Central Province, the new procedures regarding the new initiation process could be disseminated to the Province President, Chapter Advisors and chapter members during its biannual C. Roger Wilson Conference.

¶ 5 Kenner first attempted to join Kappa at the University of Pittsburgh in 1994. Although he began the initiation process, he took a leave of absence from the university before becoming a full member. Subsequently, in February 1996, Kenner reapplied to the Beta Epsilon Chapter. On the evening of February 12, 1996, the members of the Beta Epsilon Chapter held an introductory meeting with prospective members, including Kenner, and Kevin Clark (Chapter Advisor). During two subsequent meetings, chapter members engaged in psychological and physical hazing of Kenner and other initiates. Then on March 29th, a chapter member instructed Kenner to report to another chapter member's apartment for a meeting. While attending the meeting, members Damon Williams, Timothy Jones, Eric Cofield and Milton Robinson collectively struck Kenner over two hundred times on his buttocks with a paddle. Neither Clark nor Morris (who was then the East Central Province President) attended the latter three meetings. After the beating, Kenner went to the bathroom and found his scrotum swollen and his buttocks numb. The following day, Kenner drove to the hospital presenting with blood in his urine and genital swelling. As a result of the beating, Kenner suffered renal failure, seizures and hypertension requiring three weeks of hospitalization and kidney dialysis.

¶ 6 Kenner filed a lawsuit sounding in negligence against the defendants, individually and in their official capacity with Kappa. Following discovery, Kappa, Brown (Beta Epsilon's Alumni Chapter President), Morris (East Central Province President), Clark (Beta Epsilon's Chapter Advisor), Nuridden (National Chairman of Undergraduate Affairs), and Bass (National Chairman of Chapter Advisors) filed motions seeking summary judgment. The trial court, the Honorable Cynthia A. Baldwin presiding, granted the defendants' motions. Kenner then filed this appeal.

¶ 7 Kenner presents the following questions for this Court's consideration:

I. Kappa Alpha Psi knew that pledges were being hazed and banned the practice in 1949. Nevertheless, the problem persisted and in 1994, a pledge in Missouri was killed. Kappa Alpha Psi advertised the institution of a moratorium on accepting new members until it could adopt procedures to stop hazing. The moratorium was lifted in 1996 and [Kenner], believing that effective procedures had been adopted, pledged the fraternity. He was severely beaten in a hazing incident. Under the circumstances, did Kappa Alpha Psi have a duty to protect [Kenner]?

II. Kappa Alpha Psi admitted that all members took an oath to attempt to prevent hazing. The individual defendants took no actions to attempt to stop hazing. Clark and/or Morris allowed [Kenner] to seek membership at the University of Pittsburgh in violation of fraternity policies that did not allow the intake of new members at the time. Did the actions and inaction of the individual defendants render them liable to [Kenner]?

III. While [Kenner] was aware that hazing was prohibited, he also knew that some paddling of pledges was normal. [Kenner] did not consider all paddling to be hazing. When [Kenner] was severely injured in this incident, his mental state was numbed and he could not appreciate his injuries. Did [Kenner's] failure to walk away form the basis of granting summary judgment against him?

Brief for Appellant at 4. All three of Kenner's questions challenge the trial court's decision to grant the defendant's motion for summary judgment. Accordingly, we will limit our review to the general question of whether the trial court erred in granting summary judgment with respect to each of the prevailing defendants, beginning with Kappa.

¶ 8 A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 429 (2001). Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. *See Buchleitner v. Perer*, 794 A.2d 366, 370 (Pa.Super.2002). As with all questions of law, our review is plenary. *See Murphy*, 777 A.2d at 429. Furthermore, we will view the record in the light most favorable to the non-moving party, and accept as true all well-pleaded allegations, giving that party the benefit of all reasonable inferences that can be drawn from those allegations. *See Potter v. Herman*, 762 A.2d 1116, 1118 (Pa.Super.2000). In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. *See* Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact as to a necessary element

of the cause of action and the moving party is entitled to relief as a matter of law, summary judgment may be entered. *See* Pa.R.C.P. 1035.2(1).

¶ 9 A proper grant of summary judgment depends upon an evidentiary record that either: 1) shows the material facts are undisputed or 2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury. *See Buchleitner*, 794 A.2d at 370. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment. *See Basile v. H & R Block, Inc.*, 563 Pa. 359, 761 A.2d 1115, 1118 (2000).

¶ 10 Kenner contends that the trial court erred in concluding that Kappa did not owe him a duty to protect him from harm. Brief for Appellant at 13. Kenner argues that because the court accepted our Supreme Court's holding in *Alumni Assoc. v. Sullivan*, 524 Pa. 356, 572 A.2d 1209 (1990), it arrived at the erroneous conclusion that Kappa could not be held liable for Kenner's injuries. Brief for Appellant at 13.

¶ 11 In order for Kenner to defend against Kappa's motion for summary judgment he had to adduce facts sufficient to establish a *prima facie* case of negligence. *See Rauch v. Mike–Mayer*, 783 A.2d 815, 823–24 (Pa.Super.2001). To establish a viable cause of action sounding in negligence against Kappa, Kenner had to adduce evidence suggesting that: 1) Kappa owed him a duty; 2) Kappa failed to conform with its duty; 3) that there is a close causal connection between Kappa's failure and the resulting injuries; and 4) that Kenner sustained actual loss or damage. *See Ney v. Axelrod*, 723 A.2d 719, 721 (Pa.Super.1999).

¶ 12 Here, the trial court, in applying our Supreme Court's reasoning in *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000), determined that Kappa did not owe Kenner any duty and therefore could not be held liable for his injuries. Trial Court Opinion, dated 10/23/01, at 13. Additionally, both the defendant and the trial court cite *Sullivan* as authority on the question of duty.

¶ 13 Initially, we find *Sullivan* distinguishable. In *Sullivan* our Supreme Court was asked to expand an exception to the Social Host Doctrine; namely an exception imposing liability on social hosts who knowingly serve alcohol to minors. *See Sullivan*, 572 A.2d at 1212. The Court held that the fraternity did not owe the appellant any duty to protect him against the unforeseeable risk of harm appellant caused to a neighboring fraternity. *See id.* at 1210. It is clear that the Court limited its holding to the factual matrix of the case and declined appellant's invitation to expand social host liability to fraternal organizations. As this case does not involve the Social Host Doctrine, *Sullivan* does not bind us in the present matter. For the following reasons, we disagree with the trial court's conclusion that Kappa did not have a duty with respect to Kenner.

¶ 14 In *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166 (2000), our Supreme Court enunciated several factors that our courts are to *balance* in determining whether a party owes another a duty:

(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *See generally Dumanski v. City of Erie*, 348 Pa. 505, 34 A.2d 508, 509 (1943)

(relationship between the parties), *Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147, 150 (1963) (social utility), *Clewell v. Pummer*, 384 Pa. 515, 121 A.2d 459, 463 (1956) (nature of risk), *Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623, 630 (1999) (foreseeability of harm), *Cruet v. Certain–Teed Corp.*, 432 Pa.Super. 554, 639 A.2d 478, 479 (1994) (relationship, nature of risk and public interest in the proposed solution). *See also Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Texas 1994) ("In determining whether to impose a duty, this Court must consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the actor.").

*Althaus*, 756 A.2d at 1169. These factors have evolved from an underlying conception of duty of which our courts must not lose sight. A duty of care arises "only where a reasonable person would recognize the existence of an unreasonable risk of harm to others through the intervention of such negligence." *Mazzagatti v. Everingham by Everingham*, 512 Pa. 266, 516 A.2d 672, 678 (1986) (citing W.P. Keeton, *Prosser and Keeton on Torts* (5th ed.1984) at 199).

¶ 15 In analyzing *Althaus*, the trial court focuses on the relationship between Kappa and Kenner and ultimately concludes no duty is owed to Kenner because the nature of their relationship is *"de minimus* at best." Trial Court Opinion, dated 10/23/01, at 13. The court did not, however, consider the full scope of the relationship as established by the parties' deposition testimony. With respect to the first factor, we note that Kenner was obliged to pay Kappa an application fee of $237.00 and sign a membership agreement with Kappa. Reproduced Record (R.R.) at

113A. In exchange, Kenner was permitted to seek membership with Kappa. Such a relationship is, at a minimum, contractual in nature, requiring performance by both parties. The second factor weighs in favor of imposing a duty, as the social utility of a national fraternity's efforts to stop hazing is not in dispute. Turning to the third factor, the nature of the harm is clear and certainly foreseeable. Renal failure and the possibility of death are substantial harms and injuries Kappa knew could (and did) occur during the initiation process. N.T. Hamilton Deposition, 7/18/00, at 79; R.R. 144A. The consequences of imposing this duty on Kappa is minimal as it has taken steps to protect initiates by banning hazing and instituting new intake procedures. Further, there is a substantial public interest in assuring that individuals will not die or suffer substantial injury in an attempt to become members of a fraternity. Therefore, we conclude that the factors weigh heavily on imposing a duty on Kappa and its officers to protect initiates from harm.

■ ¶ 16 Notwithstanding our conclusion that Kappa owed Kenner a duty, we find nothing in the record suggesting that it breached that duty. To that end, Kenner directs us to Dr. Catherine C. Scroggs's expert report and the fact Scroggs opined that Kappa breached its duty. Brief for Appellant at 18. Specifically, Scroggs's opined that "[a] brief two-year moratorium seemed to be a symbolic gesture rather than an action with any substance if its goal was to eliminate hazing." March 19, 2001 Letter of Dr. Scroggs, at 4; R.R. at 118A. Scroggs fails however to refer to facts, testimony or empirical data supporting her opinion. Such opinions without reference to facts in the record do not give rise to a genuine issue of material fact as to Kappa's alleged breach. *See Checchio v. Frankford Hosp.—Torresdale Div.*, 717 A.2d 1058, 1062 (1998) (concluding that expert offered subjective opinion without reference to medical literature or expert's research and therefore opinion was too unreliable to send to jury). Absent such facts, we conclude that Kenner failed to make out a *prima facie* case of negligence to overcome Kappa's summary judgment motion. Accordingly, we conclude that the trial court did not err in granting Kappa's motion for summary judgment.

■ ¶ 17 In concluding that the individual defendants did not have a duty to protect Kenner, the trial court notes that none of the individuals knew Kenner and therefore did not maintain a relationship with him. Trial Court Opinion, Dated 10/23/01, at 15–16. "Relationship," as the term is employed in case law, does not rely, however, on an acquaintance between parties. For example, our Supreme Court has stated that a driver of a vehicle owes a duty of care to all motorists and pedestrians "in his immediate zone of danger." *Mazzagatti*, 516 A.2d at 679. No one disputes the fact that all of the defendants were aware that the moratorium was lifted to allow the admission of new members. Indeed, Samuel C. Hamilton, Historian for the Hartford Alumni Chapter of Kappa Alpha Psi, indicated that all of the named defendants were responsible for preventing hazing and that by signing Form 60 (Kappa's "Undergraduate Chapter Request to Initiate" form), "they understand, and they will do all as officers and members to prevent any violation of the ... statutes of [Kappa] in the constitution. That is part of the oath of their membership." N.T. Hamilton Deposition, 7/18/00, at 180–81; R.R. at 153–54. Applying the same rationale for concluding Kappa's duty, we conclude that the individual defendants also have a duty to protect Kenner from harm.

¶ 18 With respect to the individual defendants, Kenner fails to demonstrate how those individuals (with the exception of Clark) breached their respective duties to him. He does, however, detail Clark's conduct and posits how Clark's conduct manifestly breached his duty. Brief for Appellant at 21. Although Clark knew that the moratorium prohibited a "membership meeting and intake process," he nonetheless indicated to Beta Epsilon members that an "interest meeting" was permissible. N.T. Clark Deposition, 8/17/00, at 71; R.R. at 212. We further observe that although Clark felt obliged to talk to prospective members about hazing at the interest meeting, there was no discussion regarding hazing or how it was defined nor did Clark direct them to any of the Executive Orders, fraternity bylaws or its constitution regarding hazing. N.T. Clark Deposition, 8/17/00, at 96–97; R.R. at 214A–215A. In fact, Clark admits that he did not say anything during the interest meeting. N.T. Clark Deposition, 8/17/00, at 95; R.R. at 214A.

¶ 19 In reviewing Clark's testimony, Scroggs points out that Clark did not understand the new membership intake process and did not take steps to find out what activity had occurred after an informational meeting he conducted. Expert Report at 3; R.R. at 117A. Scroggs states that Clark should have told initiates the next steps of the initiation process as a means of monitoring the membership intake process. Expert Report at 3; R.R. at 117A. Scroggs opines that had Clark been more engaged in the membership process, Kenner would not have sustained his injuries. Expert Report at 3; R.R. at 117A. Clark is the only defendant that Scroggs specifically mentions in formulating her opinion. Expert Report at 4; R.R. at 117A. Also, Clark's testimony is the only factual material upon which Scroggs bases her opinion that a duty had been breached

and had been a substantial factor in Kenner's injuries. Accordingly, Kenner has established a *prima facie* case of Clark's negligence. As with Kappa, however, Kenner has failed to set forth facts sufficient to establish that Bass, Nuridden, Morris, Brown, or Doster breached their duty or that their conduct was a substantial factor in Kenner's injuries. Therefore, we conclude that the trial court erred in granting Clark's motion for summary judgment but correctly granted summary judgment to the other defendants. For the foregoing reasons, we affirm in part and reverse in part the trial court's order granting summary judgment.

¶ 20 Order **AFFIRMED** in part and **VACATED** to the extent the trial court granted Kevin Clark's motion for summary judgment. Case **REMANDED** for trial. Jurisdiction **RELINQUISHED.**